# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- | ) |
| | ) |
| Andy Phillips | ) ASBCA No. 59045 |
| | ) |
| Under Contract Nos. NAFZU1-06-T-0231 | ) |
| NAF1B1-12-T-0071 | ) |

APPEARANCE FOR THE APPELLANT:     Mr. Andy Phillips
                                                  Concessionaire

APPEARANCES FOR THE GOVERNMENT:    Raymond M. Saunders, Esq.
                                                  Army Chief Trial Attorney
                                                  Robert B. Neill, Esq.
                                                  Trial Attorney

## OPINION BY ADMINISTRATIVE JUDGE THRASHER

Pro se appellant, Mr. Andy Phillips, appeals eight claims alleging breach of contract arising from two concessionaire contracts with an Army Non-Appropriated Fund Instrumentality (NAFI) to operate a restaurant as a concessionaire on an Army base in Germany.[1]

## FINDINGS OF FACT

*Contract No. NAFZU1-06-T-0231*

1. On 19 June 2006, the IMA-Europe Region Non-Appropriated Fund contracting office (government) awarded Contract No. NAFZU1-06-T-0231 (contract) to Mr. Andy Phillips. The contract was a concessionaire contract for management and operation of Tumbleweed Restaurant (Tumbleweed), a Southwestern USA/Mexican style restaurant, in the Vilseck Military Community at U.S. Army Garrison (USAG)-Grafenwoehr, Germany (Vilseck). The contract identified a restaurant facility in Building 607 of the Langenbruck Center as the restaurant's location. (R4, tab 1 at 1R, 3-4)[2]

---

[1] Neither party alleges that our jurisdiction is based on the Contract Disputes Act. Since we have jurisdiction pursuant to the Disputes clause of the contract and the basis of our jurisdiction is not material to our consideration of the issues presented, we do not address the issue.

[2] All references to page numbers in the Rule 4 file refer to consecutively-numbered pages.

2. The contract performance period consisted of a base period of one year from 1 July 2006 to 30 June 2007 with four additional one-year option periods, not to exceed a total of five years (R4, tab 1 at 14, §§ F-1, F-2). In addition, by its terms the contract could be extended for an additional six months beyond the five years under certain conditions (*id.*, § F-2b.). The government exercised all four option years and extended the contract for two additional six-month periods, resulting in a final end date of 30 June 2012 (R4, tabs 4, 7, 9, 17, 20, 23).[3]

3. Section C-2 of the contract listed the concessionaire's responsibilities under the contract and provided, in part:

C-2. CONCESSIONAIRE RESPONSIBILITY

a. The Concessionaire shall:

....

xiv. Provide bar, kitchen and restaurant equipment necessary to operate each food/bar service activity (except for the NAFI/Government provided equipment identified herein) and to keep each activity operating in accordance with the hours of operation identified at Section J Exhibit B and to effectively and efficiently serve the customers of the activity....

....

xxii. May install additional equipment based on the availability of adequate utilities. The concessionaire shall request approval to install additional equipment from the COR who will coordinate such request and approval with the Vilseck Military Community DPW. Additional equipment shall not be installed without this approval.

---

[3] Base period, 1 July 2006 – 30 June 2007; 1st Option, Modification (Mod.) No. P00001, 1 July 2007 – 30 June 2008 (R4, tab 4); 2nd Option Period, Mod. No. P00004, 1 July 2008 – 30 June 2009 (R4, tab 7); 3rd Option period, Mod. No. P00005, 1 July 2009 – 30 June 2010 (R4, tab 9); and 4th Option Period, Mod. No. P00008, 1 July 2010 – 30 June 2011 (R4, tab 17). Contract extended for six months by Mod. No. P00009, 1 July 2011 – 1 January 2012 (R4, tab 20) and an additional six months by Mod. No. P00010, 1 January 2012 – 30 June 2012 (R4, tab 23). All modifications were bilaterally executed.

....

xxiv. Safeguard all Concessionaire owned supplies, assets and maintain property insurance for concession owned property located within the concession. Title to such shall remain in the Concessionaire.

....

xxvii. Incur the repair and/or replacement cost for any NAFI/Government provided equipment identified at Exhibit "D[.]"

(R4, tab 1 at 4-9)

4. Section C-4 of the contract listed the government's responsibilities and provided, in part:

C-4. THE NON-APPROPRIATED FUND ACTIVITY (NAFI) SHALL:

a. Provide to the Concessionaire adequate space and utilities (electricity, water, sewage) at NO cost to the Concessionaire necessary to conduct service activities as more particularly described herein.

b. ...Department of Public Works (DPW) utilities support (Reference AR 420-10) will be provided upon contract award and should continue to be provided at no cost to the Concessionaire.... The NAFI will not provide civilian telephone service to the Concessionaire. The Concessionaire is required to install and pay for a civilian telephone line for as long as the contract is in existence....

....

e. Provide for each location one each [V]eri[F]one for credit card sales. The cost of accepting credit cards in lieu of cash payments shall be an assumed cost of doing business by the Concessionaire. The Concessionaire shall be responsible for the monthly rental fee of the [V]eri[F]one which will be deducted from the concessionaire's share profits.

3

f. Provide a list of NAFI furnished equipment and property available to the Concessionaire (Section J, Attachment D).[4] The Concessionaire may utilize this equipment and property free of charge. The Concessionaire shall coordinate with the COR which items of NAFI furnished equipment and property they will utilize under the Contract.... The concessionaire may request additional NAFI equipment be provided from the COR. If the NAFI is able to provide the requested equipment such equipment shall be added/identified on the Concessionaire's inventory list. The Concessionaire will be provided detailed property management instructions for the NAFI furnished supplies and equipment by the COR. Title and ownership of NAFI furnished equipment will remain with the NAFI.

g. Appoint a COR, in writing, for each Concessionaire operated activity identified in paragraph C-2, a, i. The COR shall serve as the liaison between the Concessionaire and the Contracting Officer. The Concessionaire shall contact the COR concerning administrative matters affecting the contract; however, the COR does NOT have authority to affect any changes to the contract's terms and conditions. Changes to the contract may only be accomplished by issuance of a written contract modification that has been signed by the Contracting Officer.

h. Pay to the Concessionaire the percentage of Gross income identified in Section B. SUPPLIES OR SERVICES/PRICES/COSTS.

....

k. Provide a cash register which utilizes a computer based inventory and sales accountability program, operates each service activity independently, maintains and retains

---

[4] Section J, attachment D, list includes: 1 Refrigerator, 6 door; 1 Stove, electric 4-burner; 1 Fryer, Deep Fat-Double Vat; 1 Ice machine, small; 1 Char Broiler, Electric; 1 Sink Metal Double-Well; 1 Cash Register; and 1 VeriFone (for credit cards) (R4, tab 1 at 43).

4

daily department totals and safeguards the funds contained therein. The cash register shall keep completed and accurate records of all transactions required each sale transaction [sic] to be entered in the cash register system in full view of the customer and establish internal control procedures that are equivalent to those prescribed in AR 215-1 and AR 215-5, copies of which are available for the COR. The cash register system must produce a receipt for the customer which identifies, as a minimum, the date of the transaction, a transaction number and the total amount due the Concessionaire for the goods/services listed thereon and an internal audit tape with the same information that is turned in daily as part of the Daily Cashier Record.

(R4, tab 1 at 10-12)

5. Section H, Special Contract Requirements, provided the following with respect to NAFI furnished and concessionaire property:

> H-3. NAFI FURNISHED PROPERTY.
> The NAFI may furnish to the Concessionaire NAFI owned property for use only in connection with and under the terms and conditions of this contract.... The Concessionaire assumes the risk of, and shall be responsible for, any loss or damage to any NAFI owned property furnished hereunder, upon delivery to him, except for reasonable fair wear and tear....
>
> ....
>
> H-6. CONCESSION PROVIDED PROPERTY/EQUIPMENT
> Title to all property and equipment provided by the Concessionaire in support of this agreement shall remain in the Concessionaire. The NAFI assumes NO responsibility for the Concessionaire's property against accidents, natural disasters or other occurrences that the NAFI has no control over. The NAFI may not be held liable for acts by persons other than those of its employees or agents.

(R4, tab 1 at 18-19)

5

6. Other pertinent contract clauses incorporated into the contract are as follows:

**NONAPPROPRIATED FUND
INSTRUMENTATLITY (NOV 2004) (BI-002)**

The Nonappropriated Fund Instrumentality (NAFI), which is a party to this contract, is a nonappropriated fund instrumentality of the Department of the Army. NO APPROPRIATED FUNDS OF THE UNITED STATES SHALL BECOME DUE OR BE PAID THE CONTRACTOR BY REASON OF THIS CONTRACT. This contract is NOT subject to The Contract Disputes Act of 1978.

(R4, tab 1 at 20)

**CONTRACT TERMS AND CONDITIONS—
COMMERCIAL ITEMS (NOV 2004) (BI-008)**

....

(c) Changes. Changes in the terms and conditions of this contract may be made only by written agreement of the parties.

(R4, tab 1 at 22-23)

**DISPUTES (NOV 2004) (BI-079)**

(a) This contract is subject to the rules and regulations promulgated by the Secretary of Defense and Secretary of the Army for NAF contracting.

(b) The contract is not subject to the Contract Disputes Act of 1978 (41 U.S.C. 601-613).

(c) All disputes arising under or relating to this contract shall be resolved under this clause.

(d) "Claims," as used in this clause, means a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract forms, or other relief arising under or relating to this contract. A claim arising under a contract, unlike a

6

claim relating to that contract, is a claim that can be resolved under a contract clause that provides for the relief sought by the claimant. A voucher, invoice, or other routine request for payment that is not in dispute when submitted is not a claim under this clause. The submission may be converted to a claim under this clause, by complying with the submission requirements of this clause[,] if it is disputed either as to liability or amount or is not acted upon in a reasonable time.

(e) (1) A claim by the Contractor shall be made in writing and submitted to the Contracting Officer for a written decision....

(2) For Contractor claims exceeding $100,000, the Contractor shall submit with the claim a certification that –

(i) The claim is made in good faith;

(ii) Supporting data are accurate and complete to the best of the Contractor's knowledge and belief; and

(iii) The amount requested accurately reflects the contract adjustment for which the contractor believes the NAFI is liable.

(3) (i) If the Contractor is an individual, the certification shall be executed by that individual.

....

(f) For contract claims of $100,000 or less, the Contracting Officer must, if requested in writing by the Contractor, render a decision within 60 days of the request. For Contractor-certified claims over $100,000, the Contracting Officer must, within 60 days, decide the claim or notify the Contractor of the date by which the decision will be made.

(g) The Contracting Officer's decision shall be final unless the contractor appeals as provided in paragraph (h) of this clause.

(h) The Contracting Officer's decision on claims may be appealed by submitting a written appeal to the Armed Services Board of Contract Appeals within 90 days of receipt of the Contracting Officer's final decision.

> Decisions of the Armed Services Board of Contract
> Appeals are final and are not subject to further appeal.

(R4, tab 1 at 36-37)

*The Move to Building 227*

7. Mr. Phillips operated Tumbleweed in Building 607 through option year three of the contract (ending 30 June 2010) (R4, tab 9; tr. 1/116).

8. In early April 2010, towards the end of option year three, the government and Mr. Phillips met to discuss the feasibility of moving Tumbleweed from Building 607 to Building 227 (tr. 1/114, 4/10). Individuals from Garrison Command, Morale Welfare and Recreation (MWR) and the Department of Public Works (DPW) were present (tr. 2/171). The government had various reasons for wanting to change the location of Tumbleweed. The government wanted to move the warrior zone, a high tech soldier-only recreation center, into the space then occupied by Tumbleweed in Building 607 (tr. 1/115-17, 2/103, 139). At the time of planning it was also thought that the move would be beneficial to Tumbleweed as it would provide the concessionaire with more seating, more parking, and a larger kitchen (tr. 1/175, 217, 2/137-38, 161-62). The new location was also closer to the commercial district of Vilseck, and it was thought that there was an opportunity for increased sales (tr. 1/175, 2/162).

9. By email dated 15 April 2010, contracting officer representative (COR) Kathryn Heater summarized:

> Current Location is Langenbruck Center, Sudlager Geb.
> 607, 92249 Vilseck. Mr. Andy Phillips, Concessionaire
> for the Tumbleweeds Tex-Mex Restaurant has agreed to
> move to new location Sudlager Geb 227, 92249 Vilseck.
> Current building #227 is under renovation, when
> renovation has been completed Mr. Phillips will be
> informed and have a 30 day notice to move.

Mr. Phillips was copied on the email and did not contemporaneously object to the email's characterization of his agreement to move to Building 227. (R4, tab 28; tr. 1/203-04) Mr. John Ramsey, the MWR business operations office chief, testified that his impression was that Mr. Phillips was excited about the move to Building 227 (tr. 1/203-04). We find that Mr. Phillips agreed to move Tumbleweed to Building 227.

10. Prior to Tumbleweed's move, from April 2010 through November 2010, Building 227 underwent renovations (R4, tabs 16, 28, 89; tr. 1/178, 2/170). MWR invested more than $67,000 into preparing Building 227 for Tumbleweed (tr. 2/161).

8

DPW managed the renovations (tr. 1/201). COR Heater was in charge of coordinating the move (tr. 2/118). The extent of Mr. Phillips' involvement during this time in planning the renovations and the move is unclear. However, testimony establishes that Mr. Phillips was present at more than one meeting concerning the move to and renovations of Building 227 (tr. 1/177-78, 202-205, 222, 2/98). Mr. Phillips participated in at least one meeting that helped define the scope of the renovation work that needed to be completed in the space designated for Tumbleweed in Building 227 (tr. 1/205).

11. We find that during planning for renovations of Building 227, the government explored the possibility constructing a new bar in Building 227 (R4, tab 131; tr. 1/142, 207, 228). However, after review of a quote, the construction of the bar was determined to not make business sense (tr. 1/142, 207). The bar quote was never approved or funded (tr. 1/228). The concessionaire ultimately had a small bar constructed in Building 227 after Tumbleweed moved into Building 227 (tr. 1/143, 234-35).

12. The scope of work (SOW) for Building 227 renovations was prepared by DPW (R4, tab 89; tr. 1/205). Some of the interior renovations completed included running a new main waterline, modernizing the toilet facilities, working on the floors, painting and fixing a roof leak. Construction of a bar was not included in the SOW for the project to renovate Tumbleweed's space in Building 227. (R4, tab 89; tr. 2/170)

13. Also during this time, a meeting occurred in Building 607 to discuss the upcoming warrior zone project. Mr. Ramsey, members of the DPW team and Mr. Phillips participated in the meeting to discuss where things would be placed and what equipment and installations would need to be removed (tr. 2/99). Tumbleweed had a hardwood bar installed in Building 607 (R4, tab 83; tr. 2/106). During the meeting, the question of what would happen to Tumbleweed's hardwood bar was raised (tr. 1/222-23, 2/99). DPW personnel determined that the bar would not be necessary for the warrior zone and would be torn out of Building 607 (tr. 1/223, 2/99, 104-05). Mr. Phillips indicated he could not use the bar in Building 227 because it would not fit (tr. 2/99, 105, 4/55). Mr. Ramsey testified that Mr. Phillips never expressed a preference with respect to where the bar should go after it was removed (tr. 1/223).

14. All planned renovations for Tumbleweed's space in Building 227 were completed by the end of November 2010 (R4, tab 89; tr. 1/201, 206, 2/180).

15. We find that Mr. Phillips did not attempt to remove the hardwood bar from Building 607 when Tumbleweed moved to Building 227 and we find he abandoned it (R4, tab 58; tr. 3/96, 4/27, 55). The bar was disposed of by DPW during renovations of Building 607 for the warrior zone (R4, tabs 83-84; tr. 1/223-24, 2/99).

16. Tumbleweed's move from Building 607 to Building 227 was accomplished over the course of a number of days between late November and late December 2010 (tr. 1/118-19). Approximately six individuals participated in the move. Some were MWR employees and some were not. (Tr. 2/131-32)

17. Mr. Angel Latorre was the only individual to testify about the days of the move. Mr. Latorre is the lead bartender at the Langenbruck Center Sports Bar (tr. 2/128). Over the course of three days, he assisted in the move and was responsible for driving a NAFI 7.5-ton lift truck (tr. 2/129-30). Mr. Latorre testified that during the three days that he helped Tumbleweed move, he was under the direction of Mr. Phillips. Mr. Phillips directed what items were to be placed in the truck and moved to Building 227 and directed placement of items into Building 227. (Tr. 2/130-31)

18. Mr. Latorre remembers loading a large metal table onto a double axle trailer during the move. It took all six individuals to load the table. Mr. Latorre testified that the trailer was not an MWR vehicle. Mr. Latorre also identified a picture of the kitchen service line to be the large metal table he helped to move onto the trailer. (R4, tab 85; tr. 2/132-34) Mr. Latorre doesn't know what happened to the kitchen service line after it was loaded onto the trailer. He was not involved in unloading it. (Tr. 2/132, 134-35) Mr. Phillips suggests that a DPW work order dated 23 February 2011 to "Disconnect Chef Center in Kitchen" shows that the kitchen service line was not removed at the time that Tumbleweed moved from Building 607 to Building 227 (app. br. at 14; ex. A-1). However, there was no evidence provided to show that the chef center referenced in the DPW service call is the same piece of equipment as the kitchen service line. We find that the kitchen service line was moved onto a non-MWR vehicle during the three days that Mr. Latorre assisted in Tumbleweed's move.

19. Tumbleweed reopened in Building 227 on 7 January 2011 (R4, tab 98; tr. 2/145, 148). There was a grand opening ceremony approximately one month later on 17 February 2011 (R4, tab 60).

20. Tumbleweed operated in Building 227 for approximately two years and four months, ending 30 April 2013. Initially, no contract modification was issued regarding the relocation of Tumbleweed to Building 227 (tr. 1/64). Modification No. P00008 exercised option year four, effective 1 July 2010, by bilateral agreement of both parties (R4, tab 17). While the requisition request relating to the exercise of the fourth option period discussed the move, the modification only listed Building 607 as the concessionaire's location (R4, tabs 16-17). At the end of option year four, the parties agreed to extend the performance period for an additional six months, through 1 January 2012. The modification extending the contract did not list the change of location to Building 227. (R4, tab 20) However, the memorandum of agreement, which preceded the contract modification, did note that services were being provided at Building 227 (R4, tab 19). Modification No. P00010, effective 20 December 2011, again extended the

performance period for six months, through 30 June 2012. This modification is the first to list Building 227 as Tumbleweed's place of performance. The modification was bilaterally executed by the parties. (R4, tab 23)

21. On 10 July 2012, the NAFI and Mr. Phillips entered into follow-on Contract No. NAF1B1-12-T-0071 (contract 71) for operation of the same restaurant concession by Phillips. The language of the contract remained largely unchanged from the language of the original contract. The location of the Mr. Phillips' restaurant was now described as Building #227, Vilseck Military Community. The period of performance was established as 1 July 2012 through 31 January 2013.[5] (R4, tab 24 at 1-2) The NAFI issued Modification No. P00002 to extend the contract period for three months through 30 April 2013 (R4, tabs 27-29, 31). The contract expired by its own terms on 30 April 2013.

*Tumbleweed's Operation in Building 227*

22. Building 227 is a multipurpose building with space for multiple activities (tr. 2/109). During the period of Tumbleweed's contracts, Building 227 was often used as a temporary space for different activities to operate out of while those activities' regular locations were undergoing renovations (tr. 1/173; *see* R4, tab 111). Consequently, Building 227 was constantly under construction and being renovated to accommodate activities as they moved in and out (tr. 2/125-26)

23. Building 227 is also one of the older buildings on base (tr. 2/237-38). Due to its age, it was a grandfathered building and thus exempt from compliance with building codes until a triggering event, an event requiring that a building be brought up to current building code, occurred. No such triggering event occurred prior to Tumbleweed's move into Building 227. (Tr. 2/166-67)

24. Building 227 has a dual heating system made up of a ventilation system and a radiator system (tr. 2/246-47). The ventilation system generates heat using a system of passing air over hot water to heat the air. This is completed by use of heat exchangers, which are set up in the ceiling of Building 227. (Tr. 2/205-06) The ventilation system brings the heat of the whole building to a certain level, a control point (tr. 2/246). The radiator system allows occupants of a specific location within the building to adjust the temperature by use of a thermostatic valve (tr. 2/246-47). At the time that Tumbleweed moved in, the radiator system had heating lines running through the floor panels (tr. 2/185). The cooling system is similarly a dual cooling system made up of a ventilation evaporative system and a mechanical system (tr. 2/234).

---

[5] We find that any changes to the terms in the follow-on contract from the original contract are minimal in scope and have no impact on the present appeal.

25. The heating and cooling systems are only turned on seasonally. The heating system is turned off around May 1 and is turned on again in the fall. (Tr. 2/200)

26. DPW manages repair and maintenance work for facilities on post, including Building 227 (tr. 2/169, 221-22). DPW maintains a record of all the service calls it receives. Between 3 January 2011 and 22 August 2012 DPW logged 123 service calls relating to Building 227. (R4, tab 82) The log alternates between the German and English languages and provides only cursory job descriptions. Based upon testimony we understand that some of the 123 service calls recorded were generated as a consequence of preventative maintenance projects being conducted by DPW (tr. 1/160). Some items on the log are duplicates or upon investigation were discovered to have been caused by the same problem incident (R4, tab 82; tr. 2/223, 230). Some jobs relate to areas of Building 227 not associated with Tumbleweed (tr. 1/232, 3/11). The log also includes such minor requests as requests to change a light bulb or fix a doorbell (R4, tab 82).

27. The following are the incidents proven to be related to Tumbleweed. All the incidents arose in February and March of 2012.

28. On 1 February 2012, a problem was logged as "Repair Ventilation in Tumbleweed" (R4, tab 82). When DPW looked into the issue, it determined that there was a problem with the dining room ventilation system's antifreeze protection. DPW disconnected the system and set the heat exchanger to function in manual mode. The new antifreeze protector was installed 8 February 2012. The heating system was working· in manual mode throughout this period. (Tr. 2/214-15)

29. At about the same time, there was a separate problem with the heat exchanger in the kitchen. The problem was called in on 3 February 2012. The kitchen heat exchanger had a leak. DPW soldered the heat exchanger until it was fixed. The problem was resolved by 7 February 2012. (R4, tab 82; tr. 2/216-17). The dining room ventilation system and the radiator system still worked during this period of time (tr. 2/218). Also on 3 February 2012, a problem with a leaky pipe in Tumbleweed's ceiling was reported (R4, tabs 82, 111). DPW determined that it was not a separate issue but was caused by the ventilation issue (tr. 2/219).

30. On 13 February 2012, no heat and a broken pipe were reported (R4, tab 82). This incident was caused by cold weather. Central Europe experienced an unusually cold period of time in the winter of 2012. The extreme cold weather caused problems with the pipes and heating of multiple buildings on post. (R4, tab 115; tr. 2/153-54, 3/38). One situation report from this period of time, dated 17 February 2012, detailed, "The extreme cold weather caused water pipes [sic] ruptures in FMWR facilities. The Tumbleweed suffered its second ruptured pipe causing another interruption in service. (R4, tab 103) According to DPW, the cold weather caused both the radiator heating system and the pump of the ventilation system in the dining room to fail. The ventilation system's pump had to

be replaced and the leaks in the radiator system needed to be repaired. Neither the radiator nor the ventilation system were working at this time, and there was also a problem with the kitchen ventilation system's heat exchanger. The ventilation systems were functional by 16 February 2012. The radiant heating system did not function again until the fall. (Tr. 2/223-26)

31. The radiator system's heating lines, which ran through Tumbleweed's floor panels, developed a leak. DPW was unable to locate the source of the leak in the floor panels. Accordingly, DPW determined that it would install a new set of pipes to connect to the existing radiators. The new pipes were installed in the ceiling rather than the floor. (R4, tabs 91, 111; tr. 2/185-87) Due to the extent of the repair, DPW did not do the work itself but hired outside contractors. The contractors began work in late August 2012. (R4, tab 91) The work was completed by October or November of 2012 (tr. 2/188).

32. Building 227 can be heated without a radiator system; the ventilation system provides heat separate from the radiator system (tr. 2/199). However, the ventilation heating system has limited flexibility. The ventilation system sets a baseline temperature. Only small adjustments, plus or minus 2° Celsius, can be made from the baseline by a building occupant, but DPW has the ability to change the baseline temperature of the ventilation system. (Tr. 2/242) DPW also has space heaters that it will provide to facilities upon request (tr. 2/115, 227).

33. One individual testified that he remembered that Tumbleweed was without heat for two to three weeks in February 2012 (tr. 2/115). However, he also testified that his contact with Building 227 was limited to short visits to pick up items stored in Building 227; he was not consistently on-site or involved in the repairs (tr. 2/115-16). We weigh this individual's testimony against the testimony of DPW personnel, who were on site conducting repairs (see tr. 2/199, 214, 218). We cannot find that Tumbleweed was without heat for two to three weeks. According to Tumbleweed's daily activity reports Tumbleweed was not open for six days in February, on 4-5, 11-13, and 19 February 2012 (ex. A-2). It is unclear how it was determined that Tumbleweed would not operate on these days. At least one individual testified that closure of Tumbleweed was done at the request of Mr. Phillips (tr. 1/144).

34. On 6 March 2012 there was a leak in the roof when the snow melted. The repair was completed by 7 March 2012. (R4, tab 82; tr. 2/233)

35. On 23 March 2012, DPW identified a problem with the ventilation cooling system. At the time that the problem was identified the cooling system was not in use. DPW ordered the part necessary to fix the cooling system; it was not installed until 22 July 2012. DPW turned on the cooling systems around 1 May 2012. During the time that the ventilation system was not working, the mechanical cooling system was still operational. (Tr. 2/234-35)

13

36. Mr. Phillips provided photographs showing what appears to be water leaks and water on the floor of various parts of Tumbleweed's space in Building 227 (R4, tabs 116-28). The pictures show water on the floor of the kitchen, water leaking from a ceiling, and water on the floor of the dining room (R4, tabs 116-18, 119, 122-25, 127). However, no testimony was presented during the hearing that was able to provide context. It is unknown when the photos were taken. The Board cannot determine if the photographs represent a single incident or if they were taken at different times and represent multiple incidents.

*NAFI Provided Equipment*

37. NAFI-furnished property is listed at Exhibit D of the contract. Among the property listed at Exhibit D is one "Cash Register" and one "VeriFone (for Credit Cards)." (R4, tab 1 at 43) Mr. Hardinge, the chief of the department responsible for issuing cash registers to concessionaires where appropriate, testified that he did not receive a request to issue a cash register to Tumbleweed (tr. 2/42). However, Mr. Hardinge was not in his current position at the time that the contract began (tr. 2/44). Accordingly, there is no testimony or document in the record that contradicts Exhibit D of the contract. Furthermore, one individual testified that Tumbleweed had a cash register when it operated in Building 607 (tr. 1/190). We find that among the property furnished to the concessionaire at the beginning of the contract, the NAFI provided one cash register and one VeriFone credit card machine.

38. On 29 September 2011, Mr. Phillips purchased a new cash register. Mr. Phillips provided a copy of the invoice of the purchase. (R4, tab 33 at 11) In his claim, Mr. Phillips alleges that COR Heater told him to purchase its own cash register because there were no funds available (R4, tab 33 at 3). There is no documentary or testimonial evidence to support this claim. Nor is there any evidence explaining what happened to the cash register originally provided.[6]

39. In August 2011, the NAFI provided Mr. Phillips with a new credit card machine, the VeriFone VX570 (R4, tab 57). The VeriFone system connects by a commercial telephone line (tr. 2/16). The financial division of the MWR directorate is responsible for dealing with concessionaire credit card machines (tr. 1/93). When issues arose, Mr. Phillips would ask Mr. Doug Banks, who was appointed as the new COR by letter dated 15 January 2013, to submit a ticket to the MWR IT/MIS technician team (R4, tab 30; tr. 2/25). The MWR technician team had a policy to try to respond to tickets within three days of their submission (tr. 2/26).

40. MWR also had manual credit card machines, which were available for use by concessionaires on base (tr. 2/15, 64). No one from MWR could recall Mr. Phillips requesting a manual machine (*see* tr. 2/64).

---

[6] COR Heater was deceased by the time of the hearing.

14

41. On 21 December 2011, MWR was informed that Tumbleweed's credit card machine was not working (R4, tab 57). MWR attempted to fix the machine but was unsuccessful. MWR ordered a new VeriFone VX570 and, on 27 December 2011, MWR leant Mr. Phillips one of its special events credit card machines to use temporarily while waiting for the replacement (*id.*; tr. 2/9-11, 26).

42. MWR issued a new VeriFone machine to Mr. Phillips in May 2012 (R4, tab 57).

43. Between 8 June 2012 and 4 March 2013, six tickets were submitted to the MWR technician team regarding the credit card machine (R4, tab 57). There were a couple of causes of the credit card machine problems.

44. The first problem with the new machine was the result of the machine's automatic updates, which reset the machine's numbers causing the unit to dial the wrong telephone numbers for credit card processing. Once the government turned off the automatic updates and reset the numbers, the problem never occurred again. (Tr. 2/28-29, 37)

45. The second problem was a merchant account lock (R4, tab 57; tr. 2/38). A merchant account lock is not the result of a technical malfunction with the machine but is caused by a security measure which locks the machine due to suspected unauthorized activity (tr. 2/17-18).

46. The majority of the issues were caused by the telephone lines. For security reasons the VeriFone machines are susceptible to noise on the lines and interpret any noise as an attempt to gather credit card information. Accordingly, if the line is noisy, the unit will cancel the transaction to prevent hacking. (Tr. 2/29-30) In these instances, MWR technicians would arrive to check the unit, find no problem with the actual credit card machine and determine the problem to be with the telephone line not the machine (tr. 2/38). The last reported incident occurred on 4 March 2013. According to the MWR technician, the credit card machine was working but was unable to transmit data over the telephone lines because construction in a nearby area had knocked down the telephone lines (tr. 2/39).

47. We find that the only technical malfunction of the actual credit card machine was the first incident reported on 8 June 2012 when the machine was dialing incorrect telephone numbers.

48. Contract No. NAF1B1-12-T-0071 expired by its own terms on 30 April 2013.

49. By letter dated 8 March 2013, Mr. Phillips submitted a request to COR Banks for the payment of money damages resulting from the government's alleged breaches of the contract. The submission sought: (1) "Replacement cost of missing Tumbleweed bar from building 607" $20,000; (2) "Replacement cost Kitchen service line" $25,000; (3) "Cost of new bar paid for by Tumbleweeds in building 227" $2,970.04; (4) "Cost of new cash register paid for by Tumbleweeds for building 227" $7,871.85; and (5) "Loss of sales due to substandard building relocation" $87,982. (R4, tab 33)

50. The submission also alleged that (1) "Tumbleweeds went months without a credit card machine in 2011 and 2012 and 2013 [and lost] sales due to not being able to provide a credit card service.... Estimate loss of sales 30%" (R4, tab 33, ¶ 5). In addition, the submission alleged: (1) the government breached the contract by failing to appoint a COR after the second contract extension (at 3-4, ¶¶ 8-10); and (2) that the government administered the contracts in violation of Army regulations, specifically extending contract performance, "2 ¾ years beyond original contract of 2006 (R4, tab 33 at 7). However, there was no alleged monetary damages or other request for specific relief directly associated with either of these allegation.

51. By email dated 5 June 2013, the contracting officer (CO) wrote Mr. Phillips stating in pertinent part:

> Per your contract, all claims must be handled in accordance with the Disputes clause, I-17 Disputes (Nov 2004) (BI-079). This clause requires that a claim submitted by the contractor must be submitted to the Contracting Officer for a written decision. You never submitted a claim to me. Your claim was addressed to Doug Banks....
>
> Please prepare your written and signed certification in accordance with the clause and send directly to me. Once I receive, I will consider your claim.
>
> Also, please explain to me why you did not address any of the issues in your claim when we talked back in January.

(R4, tab 35)

52. By letter dated 8 June 2013, Mr. Phillips submitted his certified claim to the CO. In the cover letter Mr. Phillips wrote, "Please use the initial claim dated 8 March 2013 delivered by me, in person to your COR Mr. Doug Banks to be forwarded to your office as supporting documentation. As all facts and information contained [therein] are

true and in good faith and relevant to this entire matter." (R4, tab 36 at 2) The submission included the same descriptions of the claims to be paid the concessionaire as detailed in the 8 March 2013 submission. The submission also included some photos. In response to the CO's inquiry about why the claims were not raised earlier, appellant stated: "I have been asking verbally and in writing to the local command in Vilseck for a very long time to the whereabouts of my property only to be ignored and brushed aside." However, the claim submission did not include copies of any written requests dated before January 2013. (R4, tab 36) Nor were any provided in the record of this appeal.

53. By letter dated 20 August 2013, the CO issued a decision on Mr. Phillips' claims. The letter stated:

> Your claim is for the amount of $143,823.89 for breach of contract and liability for five different cost items. Those five cost items referenced are missing property (a bar and kitchen service line), purchase of a bar and a cash register, and loss of sales. Each of these cost items are summarized below along with my decision based on the facts available.

(R4, tab 48 at 3) The CO responded to each claim then separately. The CO determined that there was insufficient information to evaluate Mr. Phillips' claims for $20,000 and $25,000 for the property missing from Building 607, the hardwood bar and the kitchen service line respectively. Mr. Phillips' claim for $2,970 for purchase of a new bar for Building 227 and claim for $7,871 for purchase of a new cash register were also denied. The CO determined that there was insufficient evidence to support the concessionaire's claim of loss of sales in the amount of $87,982 due to substandard building relocation. The CO also stated that the concessionaire's claim for loss of "an estimated 30% in sales during the periods that it was not given a credit card machine by the COR" was not associated with a dollar amount. The CO concluded her decision by stating: "I have determined that the written evidence that you have submitted is insufficient or inadequate and does not adequately support your claim. I encourage you to provide any additional documentation or detailed facts to support your claim that may change my preliminary decision within the next 60 days." (R4, tab 47) The decision was sent to Mr. Phillips by email on 20 August 2013 (R4, tab 48).

54. By letter dated 4 September 2013, Mr. Phillips stated his objection to the CO's decision stating, "I disagree with your preliminary decision and stand by my claims as set forth. Your final decision is requested. (R4, tab 52) The CO did not issue a contracting officer's final decision (tr. 3/111).

55. Mr. Phillips filed a written notice of appeal from the deemed denial of its claim with the Armed Services Board of Contract Appeals by letter dated 8 November

17

2013 and we docketed the appeal as ASBCA No. 59045. A hearing was held on 15-18 July 2014.[7]

## DECISION

Appellant has appealed from the CO's deemed denial of multiple claims submitted together in one omnibus claim letter. All of appellant's claims allege that the government breached the parties' concessionaire contract. To recover on a breach of contract theory, appellant must show "an obligation or duty of the Government arising out of the contract, a breach of that duty, and damage caused by the breach that was reasonably foreseeable at the time of contract award." *Enrique (Hank) Hernandez*, ASBCA No. 53011, 01-2 BCA ¶ 31,550 at 155,832 (citing *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989)). "Remote or speculative damages...are, as a matter of law, not recoverable." *Defense Systems Co.*, ASBCA No. 50918, 00-2 BCA ¶ 30,991 at 152,965. "Appellant bears the burden of proving its claims by a preponderance of the evidence." *M.A. Mortenson Co.*, ASBCA No. 53105 *et al.*, 04-2 BCA ¶ 32,713 at 161,845. Assertions and unsupported allegations, including statements made in appellant's briefs, "do not constitute proof or evidence." *Id.* (citing *Technocratica*, ASBCA No. 46567 *et al.*, 99-2 BCA ¶ 30,391 at 150,226).

Appellant's individual claims are discussed in turn.

*Hardwood Bar Claim*

Appellant seeks reimbursement for the cost of the hardwood bar disposed of by DPW during construction of the warrior zone after Tumbleweed moved out of Building 607. The hardwood bar was a piece of concessionaire property. The contract is largely silent about what duties the government owes concessionaire property; it provides:

> Title to all property and equipment provided by the
> Concessionaire in support of this agreement shall remain in
> the Concessionaire. The NAFI assumes NO responsibility
> for the Concessionaire's property against accidents, natural
> disasters or other occurrences that the NAFI has no control

---

[7] Mr. Phillips appeared *pro se* for appellant. He was advised by the hearing judge that if he wanted to present testimonial evidence he needed to take the stand and be sworn in. He was informed that other statements he made were not record evidence and will not be used in making a decision. (Tr. 1/10-11, 149-50) Nonetheless, Mr. Phillips never testified.

18

over. The NAFI may not be held liable for acts by persons other than those of its employees or agents.

(Finding 5)

Appellant alleges this section of the contract and the decision to move Tumbleweed to Building 227 created a duty of care on the part of the government with respect to the concessionaire's property and the NAFI breached that duty when it acted negligently in handling the move (app. br. at 12-13). The government argues that the Board does not have jurisdiction over this claim because appellant's claim, as it relates to negligence, sounds in tort not contract (gov't br. at 49). However, this Board has recognized that there is a difference between a claim that is based on "an independent tort rather than a contract between the government and a contractor" and a claim "where there is a sufficient nexus between the alleged tort and the contract." *Qatar Int'l Trading Co.*, ASBCA No. 55518, 08-2 BCA ¶ 33,948 at 167,967. Where there is a sufficient nexus between the alleged tort and the contract, the claim should be considered a contract claim. *See id.* (quoting *Home Entertainment, Inc.*, ASBCA No. 50791, 99-1 BCA ¶ 30,147 at 149,137). Appellant's claims relating to concessionaire property require an examination of what duty the government owed the concessionaire in the execution of the change of the concessionaire's contractually defined location (*see* findings 1, 5). We find that there is a sufficient nexus between the alleged negligence and the contract to support a contract claim over which we have jurisdiction.

Accordingly, we examine what if any responsibilities the government had regarding Tumbleweed's move to Building 227. The parties agree that COR Heater was responsible for managing Tumbleweed's move to Building 227 (finding 10). The record also establishes that the government was not the sole actor during the move. Appellant agreed to move to Building 227 and was involved in the decision making regarding the move (findings 8-10). With respect to the hardwood bar, in particular, appellant was present at a meeting where the government informed appellant of its intention to remove the bar from Building 607 after Tumbleweed moved to Building 227. At that time, appellant expressed that he had no use for the bar (finding 13). Furthermore, appellant made no attempt to remove the bar from Building 607 when he left (finding 15).

Appellant's claim amounts to alleging that the government had a duty to store and safeguard appellant's property after he abandoned it in Building 607 until such time as appellant was ready and willing to reclaim it. Nothing in evidence suggests that the government promised to store the hardwood bar for appellant. Nor does the contract place any such duty upon the government. The government was under no obligation to protect the hardwood bar for appellant once he left it behind in Building 607. Accordingly, appellant's appeal with respect to this claim is denied.

19

*Kitchen Service Line Claim*

Appellant asserts that it is entitled to replacement cost for the kitchen service line that was located in Building 607 and allegedly went missing during the move to Building 227. It should be noted that appellant's post-hearing brief alleges a different series of events occurred during the days that the concessionaire moved from Building 607 to Building 227. Appellant alleges that "NAFI managers and their employees took control and responsibility of moving Tumbleweed Restaurant to another location." (App. br. at 13) However, the statements made by appellant in its brief are not evidence and there is no record or testimonial evidence to support appellant's allegations of the series of events. *See M.A. Mortenson*, 04-2 BCA ¶ 32,713 at 161,845.

The only evidence presented regarding the kitchen service line was that, at Mr. Phillips' direction, the kitchen service line was placed onto a non-MWR vehicle (findings 17-18). There is no evidence concerning who was driving the non-MWR vehicle, and we found that government and non-government personnel were involved in moving Tumbleweed to Building 227 (finding 16). There is no evidence of what happened to the kitchen service line after it was placed onto that non-MWR vehicle. The contract states that the "NAFI may not be held liable for acts by persons other than those of its employees or agents" (finding 5). Other than evidence that government personnel assisted in loading the kitchen service line onto a non-MWR vehicle, there is no evidence that government personnel were involved in the disappearance of the kitchen service line. Accordingly, appellant's claim is denied for lack of proof.

*New Bar in Building 227 Claim*

Appellant alleges that the government's failure to build a bar in Building 227 was a breach of contract for which it is entitled to reimbursement of the cost of construction of the new bar in Building 227 (app. br. at 14). According to appellant, the NAFI implied, as an incentive to move, that it would build a new bar in Building 227 for Tumbleweed (*id.*). The NAFI had no contractual duty to build a bar for the concessionaire in Building 227. Under the terms of the contract, the government is obligated to provide to the concessionaire only those items specifically identified in the contract. Otherwise, the concessionaire is responsible for providing "bar, kitchen and restaurant equipment necessary to operate each food/bar service activity." (Finding 3) A bar is not one of the pieces of equipment listed as NAFI-furnished property to be provided under the terms of the contract. While there is evidence that the government examined the feasibility of constructing a bar in Building 227, there is no evidence that the government promised appellant a new bar in Building 227 as an inducement to move (finding 11). Appellant has failed to prove that the government breached any contractual duties when it did not construct a bar in Building 227. Appellant's claim is denied.

*Cash Register Claim*

Appellant alleges that the NAFI breached the contract by failing to provide a cash register for the concessionaire's use per the requirements of the contract section C-4.k. Pursuant to the terms of the contract, the government has a duty to provide to the concessionaire a cash register (finding 4). We found that the government issued a cash register to appellant when contract performance began (finding 37). Accordingly, there is no evidence that the government breached its contractual duty. It is unclear why appellant purchased another cash register in September of 2011 (finding 38). However, we note that under the terms of the contract, the concessionaire and not the NAFI shall "[i]ncur the repair and/or replacement cost for any NAFI/Government provided equipment identified at Exhibit 'D'" (finding 3). *Assuming arguendo* that the cash register provided was lost or broken, prompting appellant's purchase of a new cash register in September 2011, the concessionaire was obligated by the contract's terms to incur this cost. Appellant's claim is denied.

*Building Condition Claim*

Appellant alleges that the government failed to provide adequate space and utilities to the concessionaire resulting in loss of sales. Section C-4.a. of the contract requires that the NAFI shall: "Provide to the Concessionaire adequate space and utilities (electricity, water, sewage) at NO cost to the Concessionaire necessary to conduct service activities" (finding 4). The record lacks sufficient evidence to find that government breached its contractual duty to provide adequate space and utilities.

Appellant alleges that the inadequacy of Building 227 is demonstrated by the number of service calls recorded on the service call log (app. br. at 10-11). However, the number of service calls is not conclusive evidence of the condition of the space where Tumbleweed was operating. As we found above, the service call log records incidents throughout Building 227, not simply those affecting Tumbleweed. Some of the recorded incidents on the service call log are duplicates of the same incident. Some entries were for minor repairs that one would expect to occur in any building, like a request to change a light bulb. Furthermore, the service call log recorded some preventative maintenance work and even some renovation work. (Finding 26) We also found that there was renovation work occurring regularly in Building 227 (finding 22). Appellant would have us interpret this as proof that the building was inadequate (app. br. at 11). However, the witness describing the renovations stated that the renovations were completed to adapt spaces to the needs of activities that moved in and out of Building 227, not due to some innate inadequacy of Building 227 (*see* finding 10).

Appellant was able to prove that six incidents impacted Tumbleweed. Appellant has proven that the roof leaked once. It was repaired one day after it was recorded in the service log. (Finding 34) The record also establishes that appellant had a number of

21

heating problems during the month of February 2012 (findings 28-31). The most significant problem was recorded on 13 February 2012, and Tumbleweed was without heat for three to four days. The problem was caused, not by an innate defect in the heating system, but by extreme cold that caused problems for multiple buildings on post. (Finding 30) We recognize that there were significant repercussions from the problems caused by the cold weather. Tumbleweed's radiator system was out of service from 13 February 2012 until the fall because DPW had to bring in outside contractors to fix the problem (finding 31). However, during the time that the radiator system was not working, Tumbleweed had ventilation system heating and access to space heaters (finding 32).

DPW was responsive to Tumbleweed's service calls concerning the heating problems and the roof leak, and, per the terms of the contract, its services were provided at no cost to appellant (findings 4, 28-32, 35). Other than the incident on 13 February 2012, DPW was able to resolve Tumbleweed's heating issues within a week. During the periods of repair, alternate heating was available either through alternate systems or because DPW was able to switch the system into manual mode. (Findings 28-29) DPW even identified a problem with the cooling system during the winter months, allowing it to begin addressing the issue before Tumbleweed needed its cooling system on line (finding 35).

Based upon the evidence presented, the problems in Building 227 appear as isolated incidents. We cannot find that the Building 227 was inadequate based upon evidence of one leak and heating problems which arose during one month of Tumbleweed's two-year occupancy of Building 227. The evidence presented shows that DPW addressed the issues and that due to the nature of the heating system Tumbleweed was rarely without heat. Appellant has failed to prove that the government breached its duty to provide adequate space and utilities. The claim is denied.

*Credit Card Claim*

We find that appellant failed to submit a claim for lost sales due to the NAFI's alleged failure to provide a VeriFone for credit card sales. As defined by the contract's Disputes clause, a claim "means a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain" (finding 6). On 8 June 2013, Mr. Phillips submitted a letter asserting multiple claims. The letter also stated that Tumbleweed "went months without a credit card machine in 2011 and 2012 and 2013 [and lost] sales due to not being able to provide a credit card service.... Estimate loss of sales 30%." (Findings 50, 53) Appellant failed to submit to the CO a monetary claim in a sum certain as required by the contract's Disputes clause.

*Failure to Appoint a COR*

Appellant's claim alleged that the government breached the contract by failing to appoint a contracting officer representative (COR) after the second contract extension (finding 50). However, appellant's claim did not articulate how it was allegedly damaged as a result of this alleged breach. In its post-hearing brief appellant raises the government's failure to appoint a COR only very briefly. Appellant states, "My contemporaneously [sic] complaints [concerning property lost during Tumbleweed's move to Building 227] went directly to my COR Kathy Heater, who passed away and the NAFI never appointed another COR" (app. resp. at 2). Appellant appears to have abandoned this claim. To the extent appellant has not abandoned this portion of its claim, we find that appellant failed to submit a claim. As defined by the contract's Disputes clause, a claim "means a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract forms, or other relief arising under or relating to this contract" (finding 6). There was no demand for monetary or any other relief in appellant's claim associated with this allegation. Consequently, appellant failed to submit a claim as required by the contract's Disputes clause.

*Contract Extension in Mod. P00010 and Contract 71*

Although somewhat ambiguous, appellant's claim included various allegations that the government administered the contracts in violation of Army regulations, specifically extending contract performance "2 ¾ years beyond original contract of 2006 (finding 50). Appellant also devoted a good bit of time during the hearing and space in its post-hearing brief in an effort to prove that the extension of contract performance under Contract No. NAF2U1-06-T-0231 by Modification No. P00010 and the award of Contract No. NAF1B1-12-T-0071 were improper, and he was operating under invalid contracts from 1 January 2012 onward (app. br. at 2-8). However, there were no monetary damages or other requests for specific relief directly associated with this allegation (finding 50). As a result, we find that appellant failed to submit a claim. As defined by the contract's Disputes clause, a claim "means a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract forms, or other relief arising under or relating to this contract" (finding 6). There was no demand for monetary or any other relief in appellant's claim associated with this allegation. Consequently, appellant failed to submit a valid claim as required by the contract's Disputes clause.

23

## CONCLUSION

The appeal with regard to the claims properly before us is denied.

Dated: 19 January 2016

JOHN J. THRASHER
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 59045, Appeal of Andy Phillips, rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

24